STATE of Wisconsin, Plaintiff-Appellant,

v.

Laura Mae HOOPER, Defendant-Respondent-Petitioner.

Supreme Court

*No. 79–1580–CR.  Argued April 1, 1981.—Decided April 29, 1981.*

(Also reported in 305 N.W.2d 110.)

518

For the petitioner there were briefs and oral argument by *Glenn L. Cushing,* assistant state public defender.

For the appellant the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

COFFEY, J. This is a review of a decision of the court of appeals reversing an order of the circuit court for Manitowoc county, THOMAS J. WILLIAMS, presiding. The circuit court, on the motion of defense counsel after the preliminary hearing and prior to arraignment, dismissed the criminal information charging the defendant, Laura Mae Hooper, with second-degree murder, contrary to sec. 940.02(1), Stats.,[1] on the grounds that "there was not sufficient credible evidence adduced at the preliminary examination to support the . . ." *specific charge* set forth therein.

This case concerns the death of the defendant's eight and one-half month-old daughter, Amanda Sally Hooper.

---

[1] Sec. 940.02, Stats., provides in part:

"**Second-degree murder.** Whoever causes the death of another human being under either of the following circumstances is guilty of a Class B felony:

"(1) By conduct imminently dangerous to another and evincing a depraved mind, regardless of human life; or"

The district attorney, following a John Doe proceeding investigating the cause of Amanda's death[2] issued a criminal complaint, charging the defendant, Laura Mae Hooper, with the crime of second-degree murder in causing her child's death by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life. After the preliminary examination, the court found that a felony had probably been committed and that the defendant had probably committed it and bound the defendant over for trial in accordance with sec. 970.03(7), Stats.[3] The district attorney then issued an information charging Laura Hooper with second-degree murder (as charged in the complaint) and the defendant filed a motion to dismiss the information on the grounds that "there was not sufficient credible evidence adduced at the preliminary examination . . . to support a bindover . . . ," to the trial court.

At the hearing on the motion to dismiss, the trial court, after hearing counsels' initial arguments, expressed the opinion that the evidence introduced at the preliminary examination failed to establish probable cause that the defendant committed second-degree murder.[4] After hear-

---

[2] The John Doe investigation was conducted by the Hon. Allan J. Deehr, Circuit Judge for Manitowoc County, and the record reflects it was commenced upon a petition filed by the district attorney and signed by the coroner.

[3] Sec. 970.03, Stats., provides in part:

"**Preliminary examination.** (1) A preliminary examination is a hearing before a court for the purpose of determining if there is probable cause to believe a felony has been committed by the defendant. . . .

". . .

"(7) If the court finds probable cause to believe that a felony has been committed by the defendant, it shall bind the defendant over for trial."

[4] The court stated:

"The Court is concerned, as apparently Judge Mueller was, [the judge presiding at the preliminary examination] that while

ing the trial court's expression of opinion early in the preliminary hearing, the defendant shifted the premise of her motion to dismiss from that of alleging the insufficiency of the evidence to support the bindover to one alleging the insufficiency of the evidence to support the crime of second-degree murder issued by the district attorney, and, adopting the trial judge's reasoning, argued that probable cause had not been established to demonstrate a violation of sec. 940.02(1), Stats. At the conclusion of the hearing, the court granted the motion and entered a written order dismissing the case, reciting that: "It is hereby ordered that [this action] be dismissed in that there was not sufficient credible evidence adduced at the preliminary examination to support the charge set forth in the information, to-wit: a violation of Section 940.02(1) of the Wisconsin Statutes."

The state appealed the trial court's ruling to the court of appeals. In reversing the trial judge, the appellate court held that after the defendant had been bound over for trial, the decision as to the particular charge to be filed against her was within the discretion of the district attorney, provided the charge was based on the evidence adduced at the preliminary examination. Therefore, the court held that a proper review of the trial court's dismissal of the information "requires an ex-

---

the testimony supports probable cause that a felony was committed, there's no testimony in the record from which one can infer that second degree murder was committed by this defendant. In his lead-in to the bindover, he raises the question of neglect, which would be a classified felony [sic] since death apparently resulted or at least it appears there's evidence on which that probable cause standard could be based. Would you care, Mr. Vogel, to point out to the Court what felonies, other than second degree murder, which the Court finds unsupported on the record of the preliminary examination, can be found in that record?"

amination of the preliminary evidence *ab initio* to determine if the district attorney had a reasonable basis upon which to file a charge of second-degree murder." The appellate court, upon review of the testimony elicited at the preliminary hearing, concluded that it provided a "reasonable basis" for the issuance of the charge of murder in the second degree.

The following evidence was adduced at the preliminary hearing.

Dr. Ali Mir, a pediatrician and Amanda Hooper's physician, testified that he was called to the Two Rivers Community Hospital on the afternoon of September 25, 1978, to examine the child. When he arrived at the hospital and examined Amanda, he found her to be dark blue in color (cyanotic) with no respiration or heartbeat and, while attempting to resuscitate her, observed that she had scratches on her face, a bruise on her nose and bumps on both her chest and lower left leg. He noted that the bumps on her chest and leg were not of recent origin. Failing to resuscitate her over a two-hour period, he pronounced her dead.

While attempting to revive Amanda, Dr. Mir spoke with the defendant and her husband, Robert Hooper, and asked them what had happened. Mr. Hooper's only answer was that the child had "slipped through the high chair."

Following the pronouncement of Amanda's death, Dr. Mir continued his post-mortem examination, including the taking of x-rays and gastric juices for a toxic material scan. According to his recollection, the x-rays revealed fractures of the left tibia and of a number of ribs on the left side.

Dr. Mir also related Amanda's past medical history, stating that she was abnormal at birth (January 4, 1978) in that she suffered from hydrocephalus (enlarged head), cleft palate and was a poor eater resulting in

her inability to gain weight. However, the last time that he saw Amanda prior to her death, August 1, 1978, he concluded that she had overcome the problem of hydrocephalus as that condition was arrested shortly after birth and that she was beginning to gain weight. He further noted that a complete physical examination of Amanda at that time (August 1, 1978) revealed that she was in a good general condition without any fractures and testified that he had not observed any bumps or bruises on the child on or prior to August 1, 1978. He related that the Hoopers called on September 6, 1978 and reported that Amanda had a bump on her back. An appointment was scheduled to examine her, but the Hoopers failed to show up at the assigned time. On cross-examination, Dr. Mir testified that he had no reason to suspect child abuse during the period he was treating Amanda (February 10th to August 1, 1978) and felt that the parents were handling the child well, considering her physical problems (hydrocephalus, cleft palate and failure to gain weight).

James E. Powers, the coroner for Manitowoc county, when called to the witness stand, testified that he was summoned to the Two Rivers Community Hospital on the evening of September 25, 1978, after Dr. Mir suspected child abuse. At the hospital, Powers made a brief, visual examination of the infant's body and noted that she had bruises on her forehead, chin and under her chin; scratches on her face; "an unusual swelling in [sic] the left leg between the knee and ankle[;] a swelling of the rib cage in the back . . . on the left side;" as well as "an apparent cut on the lip [and] a swelling around the nose." Powers testified that following his examination, he pronounced the child dead and signed the death certificate. Since child abuse was suspected, Powers ordered an autopsy and called the Two Rivers

police department requesting a detective to observe and investigate.

The autopsy, performed by a pathologist, Dr. John Henry Fodden, reflects that Amanda had suffered several serious injuries, described as follows: (1) two distinct linear fractures of the skull bone, one at the top or vertex of the skull and the other centrally placed at the back of the skull, almost at the nape of the neck, causing a swelling of the brain and concussive brain damage; (2) a complete transverse linear fracture of the left tibia (the larger bone in the lower part of the leg) ; (3) a diagonal linear fracture of the lower end of the left humerus (upper arm bone) ; (4) complete transverse linear fractures of three ribs on the child's back left side, all three fractures ranging from two and one-half to three and one-half inches from the backbone; (5) a "squashed, healed fracture of the nose;" and (6) five bruises about her face, four of which were in a line on the upper part of her forehead along the hairline, the fifth was centrally located under the chin; and (7) an inflammation of the lungs labelled "lipid or interstitial" pneumonitis. None of the fractures were of a compound nature, but each was evidenced by a bruise directly over the site of the break. Further, Dr. Fodden testified that the fractured ribs and tibia could have been discernible by a layman upon close examination in that the rib fractures were evidenced by swelling and puffiness in the area of the breaks and that the tibia fracture area "would move readily" when one picked up the child's left foot and wiggled it with movement of the "great toe."

The examining pathologist testified that none of Amanda's injuries were incurred on the day of her death and offered the following opinions as to their respective proximity to the date of death: the two separate skull

fractures were both approximately one week old; the fracture of the left humerus was approximately two weeks old; the rib fractures were between two and three weeks old; the broken tibia was approximately four weeks old; the fracture of the nose was at least six weeks old; the facial bruises were between three days and one week old; and the inflammation of the lungs originated after the skull fractures, within the week of death.

Dr. Fodden also testified to the degree of force necessary to cause each fracture, characterizing such force as "violent," "considerable" and "directly applied" to the site of the break. He based this testimony on the resilient nature of the bones in a child's body of this age and the fact that the most common type of fracture resulting from accidental falls of children of Amanda's age are "greenstick" fractures or "splintering, bending, angulated fracture[s]" which are directly opposite to the transverse linear type fractures suffered by Amanda. His opinion as to the requisite force was further influenced by the results of the microscopic examination of Amanda's bones revealing that her bones were normal for a child of her age, resilient and that she was free of bone disease.

When pressed to give a more specific or quantitative description of the force necessary to produce Amanda's fractures, Dr. Fodden stated that the force required to cause the type of fracture to her left tibia and left humerus was equivalent to "fifty pounds per square inch at the end of each fractured end." Further, regarding the left tibia, he noted that the type of fracture suffered by Amanda could have been caused by the force generated with the slamming of a truck door on the child's leg directly over the area of the break. Dr. Fodden characterized the degree of force necessary to cause the

skull fractures and concussive brain damage as equivalent to dropping the child onto its head on a hard floor from a height of twenty feet. He also gave an indication of the nature of the "squashed healed fracture" of Amanda's nose stating "[this type of deformity] most frequently happens to boxers. . . ."

Dr. Fodden, considering his examination of the fractured bones and assessment of the type and degree of force necessary to produce the various fractures, stated that the breaks were not caused accidentally.

Dr. Fodden testified that the cause of death was concussive brain damage resulting from the injuries to her head. He further stated that her other injuries including the rib, tibia, humerus and nose fractures, together with the lung disease, were "ancillary contributing features hastening the cause of death" in that each contributed to a state of traumatic shock.

The defendant's husband, Robert Hooper, Jr., testified that he never struck or dropped the child or did anything to injure her in any way during the months of August and September of 1978. He stated that although he occasionally gave Amanda a bath and sat with her during the months in question (August–September, 1978), his wife, Laura (defendant), was responsible for the care of the child almost all of the time as he worked a ten hour job, (4 p.m. to 2 a.m.) four or five days a week, and spent a considerable amount of his nonworking time fixing up a "van."

Mr. Hooper also recited that he never saw the defendant harm the child by striking or dropping her. However, he did observe evidence of injury to the child during the months of August and September, 1978, a bump on the child's back and left leg, as well as bruises on her face. Robert testified that he was not present when these injuries occurred, but, upon his questioning, Laura

(defendant) explained that the swelling of the left leg resulted from Amanda getting her leg caught in the stroller (seater, jumper) and that the lump on her back appeared after Robert's niece accidentally dropped the child. He stated the defendant further explained that the facial bruises were caused when Amanda bumped her head on the stroller. He did not suspect that the child suffered any broken bones.

Robert stated that on September 25, 1978, while working on the van in the garage, he heard the defendant knocking on their upstairs apartment window, and, as he exited the garage, saw the defendant break the window and heard her yell to him. He ran up to the apartment and found Amanda slouched down in the high chair with the safety belt around her chest. According to his recollection, the child's eyes were closed and she was motionless and quiet; thus, he rushed her to the hospital in his car. Upon arriving at the hospital, the defendant attempted to carry Amanda into the hospital but passed out and fell to the floor, and her husband picked up the child and rushed her into the emergency room. Robert testified that a short time after the death, the defendant attempted to explain Amanda's injury, stating that the child had fallen out of the high chair sometime before he (Robert) arrived upstairs.[5]

Mr. Hooper further explained that five other persons besides his wife, Laura (defendant) had taken care of the baby (babysat) during September and August, 1978: Laura's mother and one of her younger brothers, Robert's sister and her husband and a friend of the family. All of these people testified at the preliminary examination

[5] Robert's testimony does not recite the date when this explanation was given to him, but the record establishes that the defendant related this explanation during the course of an interview with a police detective, Bernard Geigel, on the day after Amanda's death in Robert's presence.

and expressly denied ever striking, accidentally dropping or doing anything to or with Amanda which could have caused the child injury. They further stated that they never observed the defendant or anyone else strike, drop or accidentally cause any injury to Amanda. However, two of these babysitters, Robert's sister and Laura's mother, recalled noticing a bruise on one of Amanda's legs sometime in August or September of 1978. They testified that the defendant gave them the same explanation of the cause of this injury as she gave her husband, *i.e.*, the leg got caught in the child's stroller. Neither of them suspected that the child had suffered a fracture under the bruise. Robert's sister also observed a bruise on Amanda's cheek and stated that the defendant told her that this injury was sustained when the child rolled over in her crib and hit the rails.

The final witness to take the stand at the preliminary hearing was Bernard Geigel, a detective with the Two Rivers police department. He interviewed the defendant on the day after Amanda's death and testified that the defendant explained the causes of some of the child's injuries as follows:

"She stated that about 4:45 P.M. she had Amanda sitting in a high chair. She put a strap around her stomach and left the room for a few minutes and when she came back the child was sliding out of the high chair with the strap under her arm pits and her eyes were closed and she does not remember what position the child's head was in. We talked about the child in general and she stated that the reason the child may have had a swollen left leg is because she got her left leg caught in the stroller two or three weeks ago. She stated about three or four months ago the child fell out of the seater which she had on the kitchen table and bumped her head, and the bruises on the child's head, the other bruises, were from hitting her head on the high chair and on the stroller. She also stated that on Monday afternoon, [September 25, 1978] about noon, she put Amanda in the high chair and forgot to strap her in. This time she

went into the living room and she heard Amanda fall out of the high chair onto the kitchen floor."

*Issues*

1. Did the court of appeals apply the proper standard of review in determining whether the trial court erred in dismissing the case after the bindover when it reviewed the evidence adduced at the preliminary hearing to determine whether it reasonably supported the district attorney's exercise of discretion in issuing the charge of second-degree murder?

2. Did the trial court err in dismissing the information?

## I. *Standard of Review*

As previously stated, the appellate court held that after a preliminary hearing and following a bindover, the charging decision is discretionary with the prosecutor provided it is based on the testimony received at the preliminary hearing, and therefore, the proper review required an examination of the testimony elicited therein to ascertain whether the district attorney "had a reasonable basis upon which to file a charge of second degree murder." The defendant contends that the standard of review adopted by the court of appeals was erroneous claiming that the proper standard of review is one which accepts the trial court's decision unless it is against the great weight and clear preponderance of the evidence. She argues that the appropriate standard of review is the same as applied in a review of the sufficiency of the evidence to support a *bindover*, claiming that "there is no reason in logic" for applying a different standard to a trial court's scrutiny of the evidence adduced at the preliminary hearing to determine if it supports the specific charge preferred in the information. Thus, under the defendant's analysis, the decision of the assigned trial judge (Judge Williams) in dismissing the information must be affirmed if there was competent evidence for him to act in making the

determination that the evidence received at the preliminary hearing failed to establish probable cause that the defendant committed the crime charged and that the evidence failed to establish probable cause as to the crime of second-degree murder.[6]

In response to the defendant's argument, the state contends that the respective statutes (secs. 973.03 and 971.01(1)) supply a valid reason for a different standard of review when there is a claim that the information be dismissed on the ground that the specific charge recited therein is not supported by the evidence introduced at the preliminary hearing as contrasted to a claim of insufficiency of the evidence to support a bindover. The state notes that the statutes and case law clearly demonstrate that the decision to bind the defendant over for trial rests entirely within the province of the judge presiding at the preliminary examination, sec. 973.03;[7] whereas, following the bindover, the district attorney, not the trial court, is vested with the responsibility of

---

[6] The standard of review of the sufficiency of the evidence to support a bindover is stated in *State v. Berby*, 81 Wis.2d 677, 684, 260 N.W.2d 798 (1978), as:

" 'The reviewing court can examine the evidence only sufficiently to discover whether there was any substantial ground for the exercise of judgment by the committing magistrate. *When the reviewing court has discovered that there is competent evidence for the judicial mind of the examining magistrate to act on in determining the existence of the essential facts, it has reached the limit of its jurisdiction* and cannot go beyond that and weigh the evidence.' " (Emphasis supplied and citations omitted.)

*See also: State ex rel. Cholka v. Johnson*, 96 Wis.2d 704, 712, 292 N.W.2d 835 (1980); *State ex rel. Hussong v. Froelich*, 62 Wis.2d 577, 583, 215 N.W.2d 390 (1974). This standard applies regardless of who prevails at the preliminary hearing. *Berby, supra.*

[7] *See:* fn. 3, *supra*, at 520.

weighing and examining the testimony received at the preliminary hearing and issuing the appropriate charge. Sec. 971.01(1).[8] Thus, the state agrees with the standard of review applied by the appellate court in examining the record of the preliminary hearing to determine if there was a *reasonable* basis for the district attorney, in the proper exercise of his quasi-judicial prosecutorial discretion,[9] to charge the defendant with second-degree murder.

[8] Sec. 971.01(1) provides:

"**Filing of the information.** (1) the district attorney shall examine all facts and circumstances connected with any preliminary examination touching the commission of any crime if the defendant has been bound over for trial and, subject to s. 970.03(10), shall file an information according to the evidence on such examination subscribing his name thereto."

[9] *See: Application of Bentine*, 181 Wis. 579, 587, 196 N.W. 213 (1923), stating:

" 'A public prosecutor is a *quasi*-judicial officer, retained by the public for the prosecution of persons accused of crime, in the exercise of a sound discretion to distinguish between the guilty and the innocent, between the certainly and the doubtfully guilty.' " (Citations omitted.)

*See also: O'Neil v. State*, 189 Wis. 259, 261, 207 N.W. 280 (1926) ("The district attorney is a *quasi*-judicial officer." (citations omitted)); *State v. Peterson*, 195 Wis. 351, 359, 218 N.W. 367 (1928) ("In his investigation of any alleged offense the district attorney must of necessity consult those who know the facts,— the parties who may have been wronged and their attorneys, if they have employed them. In all such cases the district attorney acts in a *quasi*-judicial capacity and determines what course should be pursued in view of the facts disclosed by his investigation"); *State ex rel. White v. Simpson*, 28 Wis.2d 590, 598, 137 N.W.2d 391 (1965) ("We recognize that the district attorney holds an office of great dignity and that in some respects he has quasi-judicial responsibilities. His decision to initiate criminal prosecution or to refuse to do so is, in a sense, a judicial determination." (citations omitted)); *State ex rel. Kurkerewicz v. Cannon*, 42 Wis.2d 368, 378, 166 N.W.2d 255 (1969) ("The district attorney in Wisconsin is a constitutional officer and is endowed with a discretion that approaches the quasi-judicial." (Citation omitted.))

This court has consistently held that in Wisconsin, prosecuting attorneys possess broad discretion in determining whether or not to charge a defendant and thereby initiate criminal proceedings. *State v. Braunsdorf,* 98 Wis.2d 569, 572–73, 297 N.W.2d 808 (1980); *City of Janesville v. Wiskia,* 97 Wis.2d 473, 480–81, 293 N.W.2d 522 (1980); *Sears v. State,* 94 Wis.2d 128, 133, 287 N.W. 2d 785 (1980); *State v. Karpinski,* 92 Wis.2d 599, 607, 285 N.W.2d 729 (1979); *Locklear v. State,* 86 Wis.2d 603, 609, 273 N.W.2d 334 (1979). One of the "leading Wisconsin case[s] regarding the exercise of prosecutorial discretion is *State ex rel. Kurkierewicz v. Cannon,* 42 Wis.2d 368, 166 N.W.2d 255 (1969)."[10] In *Kurkierewicz,* this court held:

"It is clear that in his functions as a prosecutor he has great discretion in determining whether or not to prosecute. There is no obligation or duty upon a district attorney to prosecute all complaints that may be filed with him. While it is his duty to prosecute criminals, it is obvious that a great portion of the power of the state has been placed in his hands for him to use in the furtherance of justice, and this does not per se require prosecution in all cases where there appears to be a violation of the law no matter how trivial. *In general, the district attorney is not answerable to any other officer of the state in respect to the manner in which he exercises those powers.* True, he is answerable to the people, for if he fails in his trust he can be recalled or defeated at the polls. In the event he wilfully fails to perform his duties or is involved in crime, he may be suspended from office by the governor and removed for cause. These, however, are political remedies that go not to directing the performance of specific duties but rather go to the question of fitness for office.

"The district attorney's function, in general, is of a discretionary type, the performance of which is not compellable in mandamus. 27 C.J.S., p. 648, sec. 10, *District and Prosecuting Attorneys,* summarizes, correctly we believe, the broad nature of the discretion conferred upon the district attorney:

---

[10] *Locklear, supra* at 609; *Wiskia, supra,* at 480.

" 'The prosecuting attorney has wide discretion in the manner in which his duty shall be performed, *and such discretion cannot be interfered with by the courts unless he is proceeding, or is about to proceed, without or in excess of jurisdiction. Thus, except as ordained by law, in the performance of official acts he may use his own discretion without obligation to follow the judgment of others who may offer suggestions; and his conclusions in the discharge of his official liabilities and responsibilities are not in any wise subservient to the views of the judge as to the handling of the state's case.'* " (Emphasis supplied.) *Id.* at 378–79.[11]

In Wisconsin, criminal prosecutions are usually commenced with the district attorney filing a complaint (secs. 967.05 and 968.02, Stats.) and the defendant is then entitled to a preliminary examination on a felony if the face of the complaint recites probable cause to believe the defendant committed the crime charged. *See:* Secs. 970.02(1)(c), 970.03 and 971.02(1). Following the preliminary hearing, *the presiding judge* is charged with the duty of weighing the evidence and determining whether it establishes probable cause to believe that a

[11] In *State v. Kenyon*, 85 Wis.2d 36, fn. 4 at 45, 270 N.W.2d 160 (1978), we withdrew this language in the quotation from 27 C.J.S. *District and Prosecuting Attorneys*, sec. 10, p. 648 to the extent that it conflicted with *Guinther v. Milwaukee*, 217 Wis. 334, 258 N.W. 865 (1935). *Guinther* dealt with the question of whether a prosecuting attorney has unfettered discretion to dismiss a criminal prosecution and as interpreted in *Kenyon, supra* at 45 held:

"In sum, we believe the holding in *Guinther* is clear and conclusive. Prosecutorial discretion to terminate a pending prosecution in Wisconsin is subject to the independent authority of the trial court to grant or refuse a motion to dismiss 'in the public interest.' "

Thus, the limitation that *Kenyon* placed on the rule set forth in 27 C.J.S. *District and Prosecuting Attorneys*, sec. 648 as quoted in *Kurkierewicz* is inapplicable here because this case does not involve prosecutorial discretion to terminate a pending prosecution.

felony has been committed and that the defendant has probably committed it. Sec. 970.03. Thus, the decision as to whether a defendant should be bound over for trial to the circuit court is exclusively within the realm of the presiding judge. However, once the determination is made that the evidence presented is sufficient to support a bindover, the purpose of the preliminary hearing has been satisfied, *Bailey v. State*, 65 Wis.2d 331, 341, 222 N.W.2d 871 (1974), and "the prosecutor is not bound, in presenting an information, to the particular charges advanced at the preliminary examination." *Matter of State ex rel. Lynch v. County Court*, 82 Wis.2d 454, 465, 262 N.W.2d 773 (1978). Rather, the determination of the appropriate charge to be filed is entrusted solely to the district attorney within the confines of the evidence introduced at the preliminary examination:

"**Filing of the information.** (1) The *district attorney* shall examine all facts and circumstances connected with any preliminary examination touching the commission of any crime if the defendant has been bound over for trial *and* subject to s. 970.03 (10), *shall file an information according to the evidence on such examination subscribing his name thereto.*" (Emphasis supplied.) Sec. 971.01 (1), Stats.[12]

---

[12] *See also: Application of Bentine, supra* n. 8 at 587:

"The office of district attorney is a constitutional office. It is held in the public trust, and the incumbent is charged with grave responsibilities calling for the exercise of learning in the law and sound judgment. The duties of the office should be discharged vigorously and without fear or favor. At the same time they should be discharged fairly; so discharged that persons accused of crime will not be deprived of their constitutional rights. Before filing the information it is the duty of the district attorney to make full examination of all the facts and circumstances connected with the case, and it is not presumed that his decision will be influenced by any personal bias or excessive zeal."

This court has interpreted this statute and its predecessors many times. In *Mark v. State,* 228 Wis. 377, 383–84, 280 N.W.2d 299 (1938), this court, upon a review of prior case law, held:

"It clearly authorizes the district attorney to file an information setting forth the crime committed according to the facts ascertained on such examination and from the written testimony taken thereon, whether it be the offense charged in the complaint on which the examination was had or not. . . .

"From all of these cases it clearly appears that sec. 355.17, Stats.,[13] permits the district attorney to file an information containing such charge as the facts adduced at the preliminary examination warrant. Such an information must, of course, be based upon the facts brought out on the preliminary examination. It would be improper for a district attorney, against the objection of a defendant, to file an information charging a crime wholly unrelated to the transactions or facts considered or, testified to at the preliminary examination."

Subsequently, in *Bailey v. State,* 65 Wis.2d 331, 339, 222 N.W.2d 871 (1974), this court characterized the rule espoused in *Mark, supra,* and the cases purporting to follow it as "[the] established rule in Wisconsin." Thus, *Mark* and *Bailey* clearly establish what this court recognized in *Whitaker v. State,* 83 Wis.2d 368, 373, 265 N.W. 2d 575 (1978), namely, that "[t]he charge [in the information] is within the discretion of the prosecuting attorney . . . and the statute [971.01, Stats.] provides that the prosecuting attorney shall file an information based on the evidence elicited at the preliminary examination."

The case law and statutes clearly demonstrate that after the bindover, the district attorney, in the proper

---

[13] Sec. 355.17, Stats., was the 1925 version of sec. 971.01(1), Stats. *See:* "Historical Note," West's Wisconsin Stats. Anno., sec. 971.01.

exercise of his quasi-judicial prosecutorial discretion, is entrusted with the responsibility of formulating a *specific charge* within the confines of and not wholly unrelated to the transaction or facts considered or testified to at the preliminary examination. Thus, we agree with the state and adopt a standard of review in this case which, absent an abuse of discretion in the issuance of a charge "wholly unrelated" to the facts adduced at the preliminary hearing, reaffirms the quasi-judicial independent discretionary judgment of the district attorney[14] in the determination of the particular charge to be filed. A contrary conclusion would allow courts to encroach on the quasi-judicial authority and province of the district attorney and be inconsistent with the rule that the prosecuting attorney is not limited to the opinion of the preliminary hearing judge as to the crime or crimes to be charged in the information. *Bailey, supra* at 340–41; *Hobbins v. State,* 214 Wis. 496, 510, 253 N.W.2d 570 (1934). Further, such a rule would also be inconsistent with the rule from 27 C.J.S., *District and Prosecuting Attorneys,* sec. 10, p. 648 quoted with approval in *Kurkierewicz, supra,* that:

". . . in the performance of official acts [a prosecuting attorney] may use his own discretion without obligation to follow the judgment of others who may offer suggestions; and his conclusion in the discharge of his official liabilities and responsibilities are not in any wise *subservient to the views of the judge as to the handling of the state's case."* (Emphasis supplied.)

Moreover, our decision to give deference to the district attorney in setting forth a specific charge in an information following a bindover is in accord with the approach taken in *Lofton v. State,* 83 Wis.2d 472, 266 N.W.2d 576 (1978). One of the defendant's claims in that case was that the information should have been dismissed because

---

[14] *See:* n. 8, *supra* at 531.

the evidence produced at the preliminary hearing did not support the particular charge. Citing sec. 971.01, Stats., and *Mark, supra,* this court held: 

"A district attorney is permitted to file an information containing such charges as the facts adduced at the preliminary examination warrant. The information must be based upon the facts brought out on the preliminary examination. We find that the evidence adduced at the preliminary examination is sufficient to support the charge of first degree murder in the information." *Lofton, supra* at 482.

In view of the foregoing authority, we conclude that an appropriate standard of review in this case is one which recognizes the separate responsibility of the prosecutor as contrasted to that of the courts in criminal proceedings and particularly in the interface between the complaint and the filing of an information after the preliminary hearing stage of a felony prosecution. Following a bindover, it becomes the duty of the *district attorney* to review and weigh the preliminary hearing evidence and file charges in the information in accordance with that evidence. The trial court may then *on a challenge to the bindover* review the evidence produced at the preliminary to determine if it established probable cause to believe that a felony was committed and that the defendant committed it. However, where the challenge is not to the bindover decision, but to the specific charge recited in the information (as in this case), we hold that the trial judge's review is only as to the question of whether the district attorney abused his discretion in issuing a charge not within the confines of and "wholly unrelated" to the testimony received at the preliminary examination.

II. *Abuse of Discretion*

As stated in *State v. Karpinski,* 92 Wis.2d 599, 608, 285 N.W.2d 729 (1979), "the charging decision of a dis-

trict attorney is not unlimited: it has bounds." In that case, as well as *Thompson v. State,* 61 Wis.2d 325, 329, 212 N.W.2d 109 (1973), this court looked to standard 3.9 of the American Bar Association, *Standards for Criminal Justice Relating to the Prosecution Function,* (Approved Draft 1971) for guidance in addressing claims of abuse of prosecutorial discretion. This standard in part provides:

"3.9 **Discretion in the charging decision.**
"(a) In addressing himself to the decision whether to charge, the prosecutor should first determine whether there is evidence which would support a conviction.
". . .
"(e) The prosecutor should not bring or seek charges greater in number or degree than he can reasonably support with evidence at trial."

In *Thompson, supra,* this court also looked to DR7–103 (A) of the American Bar Association Code of Professional Responsibility. That standard was adopted by this court and sets forth the following disciplinary rule:

"A public prosecutor or other government lawyer shall not institute or cause to be instituted criminal charges when the lawyer knows or it is obvious that the charges are not supported by probable cause." SCR 20.37 (1) (1980).

This court has stated:

". . . it is an abuse of discretion to charge when the evidence is *clearly insufficient* to support a conviction. It is also an abuse of discretion for a prosecutor to bring charges on counts of doubtful merit for the purpose of coercing a defendant to plead guilty to a less serious offense." (Emphasis supplied.) *Thompson, supra* at 330. *See also: Karpinski, supra* at 609.

Reading SCR 20.37, standard 3.9 of the American Bar Association Standards for Criminal Justice Relating to the Prosecution Function, *Thompson, supra,* and *Kar-*

*pinski, supra,* together with *Mark, supra,* and its progeny, we conclude that the issue before the trial court was to determine whether the district attorney abused his discretion in reciting a charge that was (1) not within the confines of the evidence adduced at the preliminary; (2) wholly unrelated to the facts and circumstances testified to at the preliminary; and/or (3) of doubtful merit for the purpose of coercing the defendant to plead guilty to a less serious offense.

The defendant does not claim that the district attorney herein abused his discretion in preferring the second-degree murder charge in order to coerce her to plead guilty to a less serious offense. Thus, we hold that in ascertaining whether the prosecutor abused his discretion, this court must look to the record of the preliminary examination to determine if the charge recited in the information was within the confines of and not wholly unrelated to the facts and circumstances testified to at that hearing. If the evidence adduced at the preliminary hearing supports the district attorney's charging decision, then it follows that the charges recited in the information are within the confines of and not wholly unrelated to the testimony elicited at that examination.

In applying this standard, however, we remain cognizant of the fact that a preliminary hearing is not a full evidentiary trial and that the purpose of a preliminary examination is only to determine whether further criminal proceedings are justified. *Taylor v. State,* 55 Wis.2d 168, 172–73, 197 N.W.2d 805 (1972).

The defendant argues that the facts established at the preliminary hearing did not warrant the charge of second-degree murder because: (1) there is no support for a finding that second-degree murder was committed; and (2) there is no support for a finding that the defendant was the one who committed the murder. She

bolsters her claims with the fact that there was no testimony describing the acts which produced the child's injuries and the fact that she did not have exclusive control of the child during the time in question (August 1st through September 25, 1978) so as to give rise to the inference that the injuries were caused by her.

The state concedes that there was no direct evidence adduced at the preliminary hearing with respect to both the nature of the conduct which produced the child's injuries, and the identity of the person engaging in that conduct. However, the state asserts that child abuse cases and in particular assaults causing the death of young children are by their very nature "secretive and usually incapable of direct proof," *People v. Massay*, 49 Ill. App. 3d 588, 594, 364 N.E.2d 933 (1977), and notes that criminal convictions may be based wholly on circumstantial evidence, *State v. Marshall*, 92 Wis.2d 101, 121, 284 N.W. 2d 592 (1979); *State v. Koller*, 87 Wis.2d 253, 266, 274 N.W.2d 651 (1979). Indeed, as recited in the Wisconsin Jury Instructions—Criminal, §170:

"It is not unusual in a criminal case to rely upon circumstantial evidence.
" . . .
"Circumstantial evidence may [often] be stronger and more convincing than direct evidence."

Thus, the state contends that if circumstantial evidence may be a sufficient basis upon which to find guilt beyond a reasonable doubt at trial, its introduction at a preliminary hearing may surely provide a reasonable basic for a specific charge and therefore argues that the nature of the conduct which produced the death causing injuries and the identity of the assailant may certainly be inferred from the overwhelming circumstantial evidence. The state asserts that the testimony of the pathologist, Dr. Fodden, supplies a reasonable basis for the con-

clusion that second-degree murder was committed and that the undisputed testimony of Robert Hooper and the others who had taken care of (babysat) Amanda during the time in question gave rise to more than a reasonable inference that the defendant inflicted the injuries, for the purposes of a preliminary hearing.

## A. *Second-Degree Murder*

The question addressed here is whether Dr. Fodden's (pathologist) testimony supports a reasonable inference that the injuries causing Amanda's death were inflicted "[b]y conduct imminently dangerous to another and evincing a depraved mind, regardless of human life;" Sec. 940.02(1), Stats.

The Wisconsin Jury Instructions define imminently dangerous conduct as to the crime of second-degree murder as that:

". . . conduct dangerous in and of itself. It must have been conduct inherently and consciously dangerous to life and not such as might casually produce death by misadventure." Wis. J.I.—Criminal §1110.

This jury instruction further describes the element of conduct evincing a depraved mind regardless of human life in the following language:

". . . The depravity of mind referred to in second degree murder exists when the conduct causing death demonstrates an utter lack of concern for the life and safety of another and for which conduct there is no justification or excuse."

Dr. Fodden characterized the degree of force required to produce the fractures of the skull, tibia, humerus, ribs and nose as "considerable" and "violent" and "directly applied." He testified the force necessary to produce the child's tibia and humerus fractures as "50 pounds per square inch at the end of each fractured

end." Further, Dr. Fodden described the force required to cause Amanda's skull fractures as equivalent to that which would be produced if the child were dropped on its head onto a hard surface from a height of twenty feet. Fodden's assessment of the causes of the varied fractures was that none of them showed any indication of an accidental origin. His overall testimony gives rise to a reasonable inference that the fractures were caused by sharp, crisp blows, applied directly over the site of the break.

The defendant argues that the pathologist's testimony is insufficient to give rise to a reasonable inference that the child's injuries were caused by conduct evincing a depraved mind, regardless of human life. She cites *Olson v. State*, 75 Wis.2d 575, 582, 250 N.W.2d 12 (1977), which states "The qualities of the conduct being imminently dangerous and evincing a depraved mind regardless of life are found in the act itself and the circumstances of its commission," and in essence claims that this statement from *Olson* requires direct evidence of the acts that inflicted the injuries.

The defendant wishes to disregard the Wisconsin case law and jury instructions on circumstantial evidence and obviously misreads the quotation from *Olson, supra,* for it expressly states that the qualities of conduct that is imminently dangerous and evincing a depraved mind, regardless of life are "found in the act itself *and the circumstances of its commission.*" (Emphasis supplied.) *id.* Thus, the language in *Olson* does not bar the proof of second-degree murder with circumstantial evidence. Since the totality of the circumstances of the commission of a particular act include the type, nature, extent and degree of force required to produce the injuries which resulted from that act, Dr. Fodden's testimony delineating the force necessary to produce the child's injuries

provides the type of circumstantial evidence envisioned in *Olson, supra.*

The defendant also contends that it is not absolutely inconceivable that Amanda's fractures were caused by accident. Dr. Fodden's testimony to the contrary stands unrefuted at this stage of the proceedings. The fact that Amanda suffered eight fractures (two on the skull, three ribs, nose, tibia and humerus) and that all eight were sustained during a short seven week period (August 1st to September 25, 1978), together with the reasonable inference that can be drawn from Dr. Fodden's testimony that she suffered from repeated acts of violence (fractures caused by "considerable," "violent" force "directly applied" to the site of the breaks), supports the prosecutor's conclusion that all of the fractures could not have had an accidental origin.

Considering the severity of Amanda's injuries as related in the testimony of Dr. Fodden characterizing the force necessary to produce the various fractures and the manner in which that force had to be applied, we conclude that the evidence adduced at the preliminary hearing supports a *reasonable inference* that the conduct responsible for the child's death was (1) inherently and consciously dangerous to life as to be imminently dangerous and (2) demonstrated an utter lack of concern for life that it evinced a depraved mind regardless of human life. This is particularly true in view of the fact that the victim was a defenseless eight and one-half month old child and that child abuse cases are secretive and seldom, if ever, provable with direct evidence. Therefore, we hold that the evidence introduced at the preliminary hearing provides a factual basis upon which the district attorney may have reasonably concluded that the crime of second-degree murder was committed.

B. *Identity*

There is no dispute that the death causing injuries were sustained between August 1st and September 25, 1978. Robert Hooper testified that the defendant was the person who was primarily responsible for the care of the child during this two-month period. Further, Mr. Hooper and all others who babysat for the child during that two-month period specifically denied having inflicted any injury or observed the child sustaining any injury. This testimony was undisputed. Thus, the only reasonable inference that one could draw from this evidence is that the injuries were sustained while the child was in the defendant's care.

The defendant argues that since others had control of the child at various times during the crucial two-month period and that the state failed to establish the "precise times" of the injuries, the evidence does not reasonably support a conclusion that the child was in her care when the injuries were sustained. She claims that the state must establish that she had exclusive control over Amanda at the time the injuries were inflicted and that evidence that others had control of the child sometime during the relevant period belies that conclusion. The defendant forgets the procedural posture in which this case arises. This is not an appeal from a trial on the merits; rather, it is an appeal from an order dismissing an information before arraignment but after a bindover decision (unchallenged). Further, a preliminary examination is not a full evidentiary trial on the issue of guilt beyond a reasonable doubt, *Taylor v. State, supra; Gaddis v. State,* 63 Wis.2d 126, 122–23, 216 N.W. 2d 527 (1974), but rather is intended to be a summary proceeding for the purpose of determining whether there is a reasonable probability that the defendant committed a felony and thus "a substantial basis for bringing the

prosecution and further denying the accused his right to liberty." *State ex rel. Huser v. Rasmussen,* 84 Wis.2d 600, 606, 267 N.W.2d 285 (1978). As the appellate court stated, the defendant's argument requires an assumption that one of the witnesses who babysat the child was lying. Thus, she is contending that the testimony of one or more of these witnesses was incredible. While this assertion may or may not be true, it involves the issue of credence or credibility and is thus a matter that is properly left for the trier of fact, the judge or the jury. *State v. Knudson,* 51 Wis.2d 270, 280–81, 187 N.W.2d 321 (1971); *State ex rel. Evanow v. Seraphim,* 40 Wis.2d 223, 228, 161 N.W.2d 369 (1968). As stated in *State v. Marshall, supra* at 115:

"We have held that 'the purpose of the preliminary is not to make a final judgment on the credibility of [a witness]; the court's role [is] simply to ascertain the plausibility of her story and whether, if believed, it would support a bindover.' *Virgil v. State,* 76 Wis.2d 133, 144, 250 N.W.2d 378 (1977). 'The preliminary hearing "'. . . is not the proper forum to debate and determine issues as to credibility and weight of evidence once essential facts as to probability have been established'"' *State ex rel. Huser v. Rasmussen,* 84 Wis.2d 600, 614, 267 N.W.2d 285 (1978), quoting *State v. Knudson,* 51 Wis.2d at 280, and *State ex rel. Evanow v. Seraphim,* 40 Wis.2d 223, 228, 161 N.W.2d 369 (1968)."[15]

[15] It should be noted that this court tempered this statement that credibility is not an issue at the preliminary examination with the following language:

"Of course, this is not to say that a defendant is to be totally prevented from attacking the credibility of a witness in any manner whatsoever at this stage of the proceeding. Where a witness' testimony is so inherently or patently incredible, that his story is not even plausible, a defendant should be allowed to demonstrate this fact at the preliminary examination." (Citations omitted.) *Marshall, supra,* n. 3 at 115.

The testimony of Amanda's babysitters was not so inherently or patently incredible as to render it implausible; thus, as stated in the text, the issue of credibility is properly left for trial.

Therefore, in view of our review of the testimony for the purposes of filing an information after a preliminary hearing and the case law and statutes applicable thereto, we hold that the district attorney did not abuse his discretion in filing the charge of second-degree murder.

*By the Court.*—The decision of the court of appeals is affirmed and the case is remanded to the trial court for further proceedings consistent with this opinion.