GARY J. SCHUSTER, District Attorney Door County
You request my opinion whether a district attorney or county corporation counsel has a duty to institute protective placement proceedings under section 55.06, Stats., or involuntary guardianship proceedings under sections 880.05 and 880.33 or to otherwise intervene where no request has been made by an official, agency or other interested person as defined in sections 55.01 (4), 55.06 (2), 880.01 (1) and (6) and 880.07 (1) under the following fact situation:
 A situation arose recently in Door County involving a seventy-five year old woman suffering advanced gangrene in her leg. Still in possession of her mental faculties, this woman elected to not seek medical attention for herself beyond in-home nursing care. *Page 189 
 It was her desire to face death and not prolong life at the cost of amputated limbs. This woman was attended at home by her brother who, while not whole-heartedly endorsing the woman's approach to her illness, did not wish to go against those desires. The Door County Department of Social Services interviewed the woman, her doctor, and members of the family. Following the interviews our office was approached with the question of whether or not any duty to act on behalf of this woman was imposed by law.
In my opinion, neither the district attorney nor the county corporation counsel have a duty under the facts given to intervene to compel such person to submit to a higher type of medical treatment by petitioning the court for protective placement under section 55.06 or appointment of a guardian on the basis of incompetency under section 880.33.
Where a chapter 55 petition has been filed, section 55.06
(1)(c) provides: "If requested by the court, the district attorney or corporation counsel shall assist in conducting proceedings under this chapter." Assistance is to be distinguished from prosecution of a petition. See 68 Op. Att'y Gen. 97 (1979) and 72 Op. Att'y Gen. 194 (1983).
The district attorney is a constitutional officer with some immemorial duties. However, the bulk of a district attorney's duties are statutory and, although there are many instances in which such officer may be called upon to exercise discretion, duties in representing the state and county are subordinate to legislative direction. State v. Coubal, 248 Wis. 247,21 N.W.2d 381 (1946); State v. Karpinski, 92 Wis.2d 599, 285 N.W.2d 729
(1979); State v. Hooper, 101 Wis.2d 517, 532, 305 N.W.2d 110
(1981). A corporation counsel has limited powers of a civil nature as prescribed by express statute or assigned from those of the district attorney by ordinance pursuant to section 59.07
(44). Section 59.47 sets forth certain duties of a district attorney, but there are many specific duties set forth in other statutes as referenced in the general index. There is no statute of which I am aware that makes it the duty of the district attorney to petition the court to compel medical care whenever such officer is advised that there is someone in the county, rich or poor, with a serious disease, ailment or condition which requires medical attention. *Page 190 
Your statement of facts assumes that the elderly person involved is "in possession of her mental faculties" and "of sound mind." The provisions of determination of incompetency on an involuntary basis under section 880.33 (1) are primarily concerned with the "mental condition of the proposed ward . . . ." Although it can be argued that one who fails to seek a high level of medical care when faced with a life threatening illness is incompetent to take care of his or her affairs, section 880.01 (4) states that "[p]hysical disability without mental incapacity is not sufficient to establish incompetence." Section 55.06 does permit a court to provide protective placement to protect the health of certain persons having a special need for medical treatment.
Section 55.06 (2)(c) includes an individual who:
 As a result of developmental disabilities, infirmities of aging, chronic mental illness or other like incapacities is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to oneself or others. Serious harm may be occasioned by overt acts or acts of omission. . . .
Section 55.01 (3), (4m) and (5) provides:
 (3) "Infirmities of aging" means organic brain damage caused by advanced age or other physical degeneration in connection therewith to the extent that the person so afflicted is substantially impaired in his ability to adequately provide for his own care or custody.
. . . .
 (4m) "Mental illness" means mental disease to the extent that an afflicted person requires care, treatment or custody for his or her own welfare or the welfare of others or of the community.
 (5) "Other like incapacities" means those conditions incurred at any age which are the result of accident, organic brain damage, mental or physical disability or continued consumption or absorption of substances, producing a condition which substantially impairs an individual from adequately providing for his own care or custody.
However, section 55.06 (1) provides in part that "[n]o protective placement . . . may be ordered unless there is a determination of incompetency in accordance with ch. 880. except in the case of a minor . . . ." Further there is some question as to its use for situations *Page 191 
where emergency medical treatment is required. In State ex rel.Watts v. Combined Community Services, 122 Wis.2d 65, 90,362 N.W.2d 104 (1985), the court stated:
 Chapter 51, Stats., application requires that a person be rehabilitable. Section 55.06 requires that a person have a permanent condition that requires only "care and custody," rather than active treatment. However, once an individual in protective placement faces involuntary mental hospitalization under sec. 55.06 (9)(d) or 55.06 (9)(e), he is in the same relationship with the state as is the person facing immediate hospitalization under ch. 51.
In your situation the individual had not been determined to be incompetent and is presumed to be competent.
Constitutional considerations with respect to the right of a person to refuse medical treatment are summarized in 16A C.J.S.Constitutional Law § 527 (1984):
 A competent individual has a right based on First Amendment religious liberty to refuse medical treatment unless the state can demonstrate a compelling interest that would justify overriding the individual's choice. [Citing Holmes v. Silver Cross Hospital of Joliet, Ill. 340 F. Supp. 125 (D.C. Ill. 1972).] In nonemergency situations involving an incompetent patient who is opposed to medical treatment on religious grounds, the court must determine what choice the patient, if competent. would have made with respect to available medical treatment. The free exercise of religion is not infringed by the refusal of a court to terminate the use of life support systems and to permit a person to die insofar as an incompetent adult in a vegetative state is concerned, in the absence of dogma of the religion of that person that life be or not be sustained by extraordinary measures. [Citing Matter of Quinlan, 348 A.2d 801 (1975) 355 A.2d 647 (1976), cert. denied Garger v. New Jersey, 429 U.S. 922 (1976).]
 Without violating First Amendment rights, blood transfusions may not be judicially ordered for a patient who objects to it on religious grounds and who is fully competent, at least where there is no compelling state interest which justifies overriding an *Page 192 
adult patient's decision; on the other hand, in view of the interest of the state in the preservation of life, blood transfusions may be judicially ordered, regardless of religious objections expressed by, or in behalf of, a patient in danger who is either unconscious, or incapable of making an intelligent choice. A statute may, without constituting an establishment of religion, preclude courts from using the receipt of public funds from compelling the performance of a sterilization procedure which is contrary to the religious beliefs or moral convictions of a hospital.
In Matter of Quinlan, 355 A.2d 647, 663-64 (N.J. 1976), it was stated:
 Presumably this right [the unwritten constitutional right of privacy] is broad enough to encompass a patient's decision to decline medical treatment under certain circumstances, in much the same way as it is broad enough to encompass a woman's decision to terminate pregnancy under certain conditions. . . .
. . . .
 . . . Ultimately there comes a point at which the individual's rights overcome the State interest. . .
 . . . Karen's independent right of choice, however, would ordinarily be based upon her competency to assert it.
The court held that by reason of the circumstances, Karen Quinlan's right of privacy could be asserted by her guardian.
In Guardianship Protective Placement of Shaw, 87 Wis.2d 503,275 N.W.2d 503 (Ct.App. 1979), the court considered section55.06 and chapter 880 and held that where protective placement is sought on grounds of alcoholism, there must be a finding of incompetency before protective placement can be ordered and that an alcoholic who continues to drink because of a preference for an alcoholic lifestyle is not necessarily incompetent.
I conclude that, under the facts stated. there is no duty to intervene to attempt to force such person to submit to a higher level of medical treatment.
BCL: RJV *Page 193