STATE of Wisconsin, Plaintiff-Respondent,

v.

Bruce A. OWEN, Defendant-Appellant.†

Court of Appeals

*No. 95–2631–CR. Submitted on briefs April 9, 1996.—Decided May 29, 1996.*

(Also reported in 551 N.W.2d 50.)

†Petition to review denied.

623

For the defendant-appellant the cause was submitted on the briefs of *Matthew A. Biegert* of *Doar, Drill & Skow, S.C.*, New Richmond.

For the plaintiff-respondent the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Michael R. Klos*, assistant attorney general.

Before Cane, P.J., LaRocque and Myse, JJ.

MYSE, J. Bruce A. Owen appeals a judgment of conviction for recklessly causing great bodily harm to a child contrary to § 948.03(3)(a), STATS., and an order denying postconviction relief. Owen contends that: (1) there is insufficient evidence to support the conviction; (2) the trial court erred by admitting expert opinion testimony based on possibilities; (3) he was denied effective assistance of counsel; (4) the trial court erroneously exercised its discretion when it refused to suppress Owen's statements to police; (5) the trial court erred by binding Owen over for trial following the preliminary hearing; (6) the trial court erred by not dismissing the information; and (7) the trial court erred when it sentenced him to the maximum possible sentence. We reject Owen's claims and therefore affirm the judgment and order.

Joseph Owen was born June 30, 1993, and died on October 9, 1993. At the time of his death, Joseph lived with his mother, Theresa C., and his father, Bruce Owen, together with Matthew P. and Heather C., Theresa's six-year-old son and three-year-old daughter.

On October 9, at around 10 a.m., Matthew woke Owen because Joseph was crying. Owen went to Matthew's bedroom, which he shared with Joseph. Matthew testified that after Owen changed Joseph's diaper, Owen slapped Joseph in the chest with an open hand to stop Joseph from crying. Matthew testified that the slap was "a little bit hard." Matthew further testified that Joseph had been crying before the slap

627

and was crying after being slapped. According to Matthew, Joseph then stopped crying, stretched out, made a growling sound and stopped breathing.

Matthew then woke Theresa, yelling "Mommy, get up, something is wrong." Theresa found Owen carrying Joseph down the hallway. Theresa testified that Joseph was gasping for breath, was jerking funny, was limp and had a red mark on his chest area. Emergency personnel responded but Joseph died at the hospital. Dr. Susan Roe, the medical examiner, initially determined the cause of death to be sudden death due to possible seizure.

Approximately three months after Joseph's death, Matthew told Theresa that Owen had punched Joseph in the chest before he died. After the police found out about Matthew's statement, Earl Clark and Donald Wakeling of the St. Croix County Sheriff's Department interrogated Owen at the police station. After Owen was informed of his *Miranda*[1] rights, Wakeling aggressively challenged Owen, accusing him of lying and causing Joseph's death. Owen responded that he no longer wanted to talk to Wakeling. Wakeling left the room and Clark talked to Owen who appeared to be emotionally stressed at the allegation that he had caused Joseph's death. Owen ultimately gave Clark a statement that he "snapped" Joseph with a diaper at the time of his death.

After Roe received information about Owen's conduct, she changed the cause of death to undetermined. At trial, Roe testified that there was no evidence from the autopsy to indicate Joseph had been struck on the chest and she refused to express an opinion to a reasonable degree of medical certainty that the blow Matthew

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

described was a cause of Joseph's death. Roe, however, did testify that a blow to the chest of the infant could create a substantial risk of death or great bodily harm without leaving any medically detectable evidence and that the infant's death from cardio-respiratory arrest following closely upon delivery of the blow would be consistent with cardiac arrhythmia or seizure without leaving any medically detectable evidence.

Owen was represented by the public defender's office. The State filed a motion to remove the public defender, John Kucinski, from serving as Owen's attorney because the public defender's office had previously represented Theresa in a domestic dispute case involving Owen. Kucinski, however, was not involved in the representation of Theresa, obtained no information in regard to such representation and did not obtain access to the public defender's records in regard to that case. At the time the issue was raised, Owen specifically requested that the attorney assigned to represent him continue in his representation, notwithstanding any allegation of conflict.

At the conclusion of the trial to the court, Owen was found guilty of recklessly causing great bodily harm to Joseph and sentenced to five years in prison, the maximum possible sentence for the offense. Owen subsequently filed postconviction motions seeking a new trial based on ineffective assistance of counsel and seeking a modification of his sentence. After holding a *Machner*[2] hearing, the trial court denied Owen's postconviction motions.

---

[2] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

## SUFFICIENCY OF THE EVIDENCE

■

Owen first contends that there is insufficient evidence that he recklessly caused great bodily harm to Joseph. The State must prove each element of the crime beyond a reasonable doubt. *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752, 755 (1990). In this case, the State was required to prove three elements: (1) Owen caused great bodily harm to Joseph; (2) Owen recklessly caused such harm; and (3) Joseph had not attained the age of eighteen years at the time of the offense. *See* WIS J I—CRIMINAL 2111. Owen does not challenge the third element.

■

We may not reverse a conviction based on insufficient evidence "unless the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *Poellinger*, 153 Wis. 2d at 501, 451 N.W.2d at 755.

> If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, an appellate court may not overturn a verdict even if it believes the trier of fact should not have found guilt based on the evidence before it.

*Id.* at 507, 451 N.W.2d at 758. It is the trier of fact's function to decide issues of credibility, weigh the evidence and resolve conflicts in testimony. *State v. Gomez*, 179 Wis. 2d 400, 404, 507 N.W.2d 378, 380 (Ct. App. 1993).

First, we address whether the evidence is sufficient to prove that Owen caused great bodily harm to Joseph, the first element of the offense. To establish causation, the State must prove beyond a reasonable doubt that Owen's acts were a substantial factor in producing great bodily harm to Joseph. *See Cranmore v. State*, 85 Wis. 2d 722, 775, 271 N.W.2d 402, 428 (Ct. App. 1978). A substantial factor need not be the sole or primary factor causing the great bodily harm. *See State v. Oimen*, 184 Wis. 2d 423, 436, 516 N.W.2d 399, 404-05 (1994).

The evidence adduced at trial shows that after Owen struck three-month-old Joseph in the chest, Joseph reacted in a convulsive manner, stopped breathing and died several hours later. In addition, Roe testified that a blow to the infant's chest could create a substantial risk of death or great bodily harm without leaving any medically detectable evidence, and that the infant's death from cardio-respiratory arrest following closely upon delivery of a blow to the chest would be consistent with cardiac arrhythmia or seizure without leaving any medically detectable evidence. While Roe could not opine to a reasonable degree of medical certainty that is what happened in this case or what the cause of death was, she could not rule out the State's theory that a blow to Joseph's chest by Owen caused Joseph great bodily harm. Based on this evidence and considering the contemporaneousness of the blow and Joseph's spasms and difficulty breathing that led to his death, we conclude that a reasonable trier of fact could properly infer that Owen's act of slapping Joseph in the chest was a substantial factor in producing great bodily harm to Joseph.

Owen, however, contends that the State was required to provide expert testimony, in the form of an opinion to a reasonable degree of medical certainty, that the alleged slap to the chest caused great bodily harm. Expert testimony, however, is required only if the issue to be decided by the trier of fact is beyond the general knowledge and experience of the average juror. *State v. Whitaker*, 167 Wis. 2d 247, 255, 481 N.W.2d 649, 652 (Ct. App. 1992).

We conclude that the State was not required to provide expert testimony in this case because the trier of fact, based on its common knowledge and experience, could conclude that the slap to Joseph's chest with some degree of force was a substantial factor in producing great bodily harm to Joseph. Because the facts adduced engender an obvious association between the act and Joseph's spasms and breathing difficulty, no expert medical testimony is necessary to establish the causal relationship. *See State ex rel. Cholka v. Johnson*, 96 Wis. 2d 704, 714, 292 N.W.2d 835, 841 (1980); *People v. Tostado*, 416 N.E.2d 353, 358 (Ill. App. 1981).

If Owen contends the spasms and ultimate death were due to an intervening cause, this would constitute a defense and he would have to bring forth evidence of the intervening cause. *See Parker v. United States*, 406 A.2d 1275, 1286 (D.C. 1979); *State v. Schulz*, 102 Wis. 2d 423, 430, 307 N.W.2d 151, 156 (1981). In this case, there was a suggestion that Joseph may have died from a seizure disorder that was unrelated to any blow. Roe, however, testified that it was not possible to determine whether Joseph had such a disorder because the diagnosis of seizures can only be made while the infant is alive, and that was not done in this case. The trier of

fact rejected the suggestion that Joseph suffered the spasms .and died because of a seizure disorder unrelated to the blow.

There is a troubling aspect to our conclusion that a fact finder may infer a causal relationship between a blow to an infant's chest and the spasms appearing immediately following the blow, based upon the general knowledge and experience of mankind. This disquietude is the result of the fact that a witness with medical training was unwilling to express an expert opinion as to the same causal relationship we are permitting the fact finder to infer. If a medically trained person is unwilling to express an expert opinion as to the existence of this causal relationship, how can we conclude that a causal relationship may be inferred by the fact finder based upon the general knowledge and experience of lay persons?

In answering this question it is first important to understand the nature of the testimony given by the medical examiner. While Roe was unwilling to express a medical opinion that the blow caused the infant's death, she also refused to express an opinion that there was no causal relationship between the blow and the infant's death. She did acknowledge that it was consistent with medical science to have a blow sufficiently hard to cause spasms and ultimately death without leaving any medically detectable evidence of the blow. Her testimony therefore established that there was no medical principle that would disprove the State's theory of causation.

Perhaps most importantly we must examine what the witness did not say. Roe did not testify that it was not medically possible to determine whether a causal relationship existed between the blow and the subsequent spasms. While she stated she had no opinion, she

did not indicate that it was impossible to establish the causal relationship based on the existing state of medical science.

The finder of fact has the ability to accept so much of the testimony of a medical expert that it finds credible. *See Brogan v. Industrial Cas. Ins. Co.*, 132 Wis. 2d 229, 239, 392 N.W.2d 439, 444 (Ct. App. 1986). This permits the fact finder to accept some of a medical expert's testimony while rejecting other portions of the same witness's testimony. *Id.* We are obligated to search the record to support the conclusion reached by the fact finder, and we must examine the medical examiner's testimony in a manner consistent with this principle. *See Poellinger*, 153 Wis. 2d at 506-07, 451 N.W.2d at 757. Roe testified that there was nothing in this case that was inconsistent with a blow being struck to the infant's chest which induced spasms and ultimately death even though no evidence of the blow could be found on the infant's body. The fact finder can accept this portion of her testimony. While she did not have an opinion whether a causal relationship existed between the blow and Joseph's death, she did not indicate that no such causal relationship could be inferred. The fact finder can disregard her failure to form an opinion as to the causal relationship and, in the absence of any testimony that it is not medically possible to establish the causal relationship, conclude that such a relationship existed.

While troublesome, we conclude that it is permissible for the fact finder to infer a causal relationship between an adult striking a three-month-old infant in the chest and the infant immediately going into spasms with difficulty breathing. Such a blow to an infant is

sufficient to satisfy the requirement of causing great bodily harm. The blow need not be the cause of the death itself. Great bodily harm is satisfied by a bodily injury which creates a substantial risk of death. Section 939.22(14), STATS. We conclude that the spasms and difficulty breathing satisfy this element. An infant who goes into spasms and stops breathing suffers a substantial risk of death. We cannot say, as a matter of law, that no reasonable trier of fact could have found that the slap was a substantial factor in causing Joseph great bodily harm based on the circumstances that include the fact that the victim was a three month-old infant. Accordingly, we conclude there is sufficient evidence of the first element of the offense.

Next, we address whether there is sufficient evidence that Owen recklessly caused such harm, the second element of the offense. "Recklessly" is defined in § 948.03, STATS., as "conduct which creates a situation of unreasonable risk of harm to and demonstrates a conscious disregard for the safety of the child." We conclude that the evidence that Owen slapped Joseph in the chest is sufficient to satisfy the second requirement. Roe testified that a slap with some degree of force to the chest area of an infant creates a substantial risk of great bodily harm. Based on common knowledge, the trier of fact could reasonably conclude that slapping a three-month-old infant in the chest with some degree of force creates a situation of unreasonable risk of harm to and demonstrates a conscious disregard for the safety of the child. Therefore, we conclude there is sufficient evidence to meet the second element of the offense.

## EXPERT TESTIMONY

Next, Owen asserts that the trial court erred by admitting Roe's response to hypothetical questions propounded by the State. The admission of expert testimony is a matter of trial court discretion. *State v. Friedrich*, 135 Wis. 2d 1, 15, 398 N.W.2d 763, 769 (1987). We will affirm the trial court's exercise of discretion as long as it has a reasonable basis and was made in accordance with accepted legal standards and the facts of record. *State v. Jenkins*, 168 Wis. 2d 175, 186, 483 N.W.2d 262, 265 (Ct. App. 1992).

Roe testified that she listed the cause of death as undetermined and had no opinion as to the actual cause of death in this case. She stated that she could not determine to a reasonable degree of medical certainty whether Joseph died from natural causes or whether a blow to his chest was a cause of his death. However, over the objection of Owen's counsel, the trial court allowed Roe to testify as follows based on the facts as described by Matthew in his testimony:

> Q Doctor, assuming the facts that I have described to you here in the hypothetical, do you have an opinion to a reasonable degree of medical certainty as to whether the blow to the chest or stomach of the child could create a substantial risk of death or great bodily harm without leaving any medically detectable evidence?
> . . . .
>
> A Yes.
>
> Q What is your opinion?
>
> Based on the hypothetical, yes.
> . . . .

636

Q Based on the hypothetical facts that I have given you, [do] you have an opinion to a reasonable degree of medical certainty as to whether the death of the child from cardio-respiratory arrest following closely upon delivery of the blow would be consistent with cardiac arrhythmia or seizure without leaving any medically detectable evidence.

. . . .

A Yes.

Q What is your opinion?

A Yes.

Owen claims that the questions inquire as to possibilities rather than probabilities and concludes that because Roe did not state her opinion as to the cause of death to a reasonable degree of medical probability the inquiries made by the State are inadmissible. Owen reasons that it is error to admit an expert opinion expressed in terms of possibilities and that medical conjecture cannot be received into evidence. *See McGarrity v. Welch Plumbing Co.*, 104 Wis. 2d 414, 430, 312 N.W.2d 37, 44 (1981).

Owen would be correct if the State elicited Roe's testimony in an effort to prove the blow caused Joseph's death. The questions, however, were elicited for an entirely different purpose—to demonstrate that such a blow could cause great bodily harm without leaving any medically detectable evidence that would be found by the doctor doing the autopsy. The purpose of the hypotheticals posed to Roe was not to prove that the blow was the cause of death but that the lack of medically detectable evidence did not exclude the blow as a cause of death. This is relevant testimony designed to assist the trier of fact in evaluating the evidence

637

placed before it. *See Friedrich*, 135 Wis. 2d at 15, 398 N.W.2d at 769.

The record discloses that the doctor could not say to a reasonable degree of medical probability that the blow was the cause of Joseph's death. Notwithstanding this limitation, the State is entitled to prove that there is no medical reason why the trier of fact could not accept the other evidence offered to show that the blow to Joseph's chest was a substantial factor causing him great bodily harm. Hypothetical questions may be used to help explain the significance of other evidence that was admitted. *Hagenkord v. State*, 100 Wis. 2d 452, 463, 302 N.W.2d 421, 427-28 (1981). Therefore, we conclude that the trial court did not err by permitting the hypothetical questions for the limited purpose they were clearly designed to serve.

## EFFECTIVE ASSISTANCE OF COUNSEL

Owen next asserts that he was denied effective assistance of counsel because his attorney had a conflict of interest arising from the public defender's office's previous representation of Theresa. Theresa was represented by public defenders Karen Smith and James Bentivegna for charges of disorderly conduct arising from a domestic dispute between Theresa and Owen. The State ultimately dismissed the complaint against Theresa, and Owen paid a forfeiture for his role in the domestic dispute.

The State filed a motion to recuse public defender Kucinski from representing Owen because of his office's previous representation of Theresa, who was likely to be a witness in the case. Accordingly, the trial court held a pretrial hearing and made inquiries as to whether a conflict of interest resulted. After the court

explained the potential conflict of interest to Owen, Owen specifically requested Kucinski be allowed to continue in his representation. Owen also agreed to notify the court if at any point he believed there was a conflict of interest.

Kucinski advised the court that he did not believe any conflict of interest existed because he had spoken with Bentivegna and Smith and inquired if they had any private statements or information from Theresa that might be relevant to Owen's trial. He was advised that no such evidence existed. Kucinski further indicated that he would remove himself from the case if such a potential conflict of interest became a reality.

Owen is entitled to a new trial if he demonstrates by clear and convincing evidence that his trial counsel actively represented a conflicting interest. *See State v. Foster*, 152 Wis. 2d 386, 393, 448 N.W.2d 298, 301 (Ct. App. 1989). The defendant must show more than a theoretical conflict of interest; he must show an actual conflict of interest. *Id.* An actual conflict of interest exists only when the attorney's advocacy is somehow adversely affected by the competing loyalties. *Id.*

Owen now contends that Kucinski had an actual conflict of interest based on Kucinski's refusal to cross-examine Theresa about the domestic dispute. Kucinski testified at the *Machner* hearing that he did not introduce evidence of the domestic dispute for strategic reasons. The trial court had ruled that it would not allow any evidence of prior misconduct by Owen if such evidence was not raised in the cross-examination of Theresa or anyone else. Accordingly, Kucinski elected for strategic reasons not to raise the issue of the domestic fight between Owen and Theresa on cross-

examination of Theresa for fear that it would open up other areas of misconduct Owen engaged in.

One of Kucinski's theories of defense was that Theresa encouraged Matthew to fabricate the circumstances of Joseph's death in order to get even with Owen. This theory was unaffected by any claimed conflict of interest. Kucinski fully and completely examined Theresa on this matter and vigorously proposed the theory of defense that Matthew's testimony was the result of Theresa's animus toward Owen and not a reflection of the events as they actually occurred. There was no conflict of interest realized in counsel's defense of Owen. The performance of Owen's trial counsel was vigorous, legitimate strategic decisions were made, and Owen's interests were not compromised by the public defender's office's previous representation of Theresa. Accordingly, we conclude that Owen has not demonstrated by clear and convincing evidence that his trial counsel actively represented actual conflicting interests.

## STATEMENT TO POLICE

Next, Owen contends that the trial court erred by refusing to suppress his statements given while in police custody. Owen alleges that his statement was taken in violation of his constitutional rights. Because this issue requires the application of constitutional principles to the facts of the case, we review this issue de novo. *State v. Pheil*, 152 Wis. 2d 523, 530, 449 N.W.2d 858, 864 (Ct. App. 1989). However, the trial court's findings of fact on this issue will not be set aside unless clearly erroneous. Section 805.17(2), STATS.

Owen first asserts that his right to remain silent was violated. Accordingly, we must first determine whether Owen invoked his right to remain silent. At the beginning of the interrogation, Wakeling advised Owen of his *Miranda* rights and Owen signed a form stating that he understood his rights. At the suppression hearing, Owen testified that he understood his rights and agreed to talk to the investigators. During the interrogation, Wakeling became very confrontational and accused Owen of lying and being responsible for Joseph's death. Owen responded emotionally to the allegation and told Wakeling that he did not want to talk to him any further. Wakeling left the room. After a brief period of silence, Owen initiated a conversation with Clark by saying "I didn't mean to do it." Clark then continued the interrogation resulting in a statement from Owen that he had "snapped" Joseph with a diaper at the time of his death.

██

The declaration that he did not wish to speak to a specific officer is not the invocation of his right to remain silent. Moreover, it was Owen who initiated the conversation with Clark after Wakeling had left the room. Because Owen's comments were specifically addressed to Wakeling and he initiated further conversations with Clark, we conclude that Owen never invoked his right to remain silent and, accordingly, the right was not violated by his continued conversation with Clark.

██

Owen next suggests that the statements he gave were involuntary because of the interrogation techniques employed by Wakeling and Clark. A statement is not involuntary in violation of the defendant's Fifth Amendment rights unless the statement was obtained

by coercive police activity. *State v. Kunkel*, 137 Wis. 2d 172, 191, 404 N.W.2d 69, 77 (Ct. App. 1987). This inquiry focuses on whether the police used actual coercion or improper police practices to compel the statement. *State v. Clappes*, 136 Wis. 2d 222, 235-36, 401 N.W.2d 759, 765 (1987). If the defendant fails to establish that the police used actual coercive or improper pressures to compel the statement, the inquiry ends. *Id.* at 236, 401 N.W.2d at 765. However, if the defendant establishes coercive conduct, the court must undertake a balancing analysis, weighing the personal characteristics of the defendant against the coercive police conduct, to determine whether the statement was voluntary. *Id.* at 236-37, 401 N.W.2d at 766.

Owen asserts that the adoption of the "good cop/bad cop" roles by the two investigators conducting the interrogation and the confrontational manner of Wakeling's interrogation render the statement inadmissible. We disagree. The adoption of roles by the investigators and Wakeling's accusation that Owen was lying and that he was responsible for Joseph's death are not improper police procedures. Further, the fact that the investigator raised his voice and invaded Owen's space by getting close to him does not establish actual coercion. *See id.* Owen does not contend that the investigators threatened him with physical violence or questioned him for an excessive period of time without a break for food or rest. *See id.* Owen's statements were the result of his state of mind and not any coercive police activity. Therefore, we conclude that Owen failed to establish that the investigators used actual coercion or improper police practices to compel the statements. Accordingly, Owen's statements were voluntary and

the trial court did not err by refusing to suppress the statements.

## PRELIMINARY HEARING

Owen next argues that the trial court erred by binding him over for trial because there was insufficient evidence adduced at the preliminary hearing that he caused Joseph's death. Owen preserved this issue for appeal by petitioning for leave to appeal, prior to trial, from the nonfinal order binding him over.[3] *See State v. Wolverton*, 193 Wis. 2d 234, 254, 533 N.W.2d 167, 174 (1996). While Owen has preserved this issue for appeal, "the test to be applied by the appellate court is whether the error at the preliminary hearing affected the trial so that it constitutes prejudicial error under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)." *Id.* A challenge to the sufficiency of evidence at the preliminary hearing does not constitute a prejudicial error affecting the trial. The State had the burden of proving causation beyond a reasonable doubt at trial, and we have already concluded that the evidence was sufficient to prove Owen caused great bodily harm to Joseph. Because the State met its burden of proving causation at an error free trial, we conclude that any claim of insufficiency of the evidence at the preliminary hearing was not prejudicial to Owen at trial. *See State v. Webb*, 160 Wis. 2d 622, 629, 467 N.W.2d 108, 111 (1991).

---

[3] We denied Owen's petition for leave to appeal on May 25, 1995.

## INFORMATION

Next, Owen contends the trial court erred by not dismissing the original information. In the original information, the district attorney charged Owen with first-degree reckless homicide contrary to § 940.02(1), STATS.

"Charges recited in the information need not be supported by probable cause." *State v. Baeza*, 156 Wis. 2d 651, 658, 457 N.W.2d 522, 525 (Ct. App. 1990). On review, we need only determine whether the charge in the information was "wholly unrelated" to the evidence adduced at the pretrial hearing. *Id.*; *see also State v. Hooper*, 101 Wis. 2d 517, 539, 305 N.W.2d 110, 121 (1981). To determine whether the charge is wholly unrelated to the evidence, we look at the parties involved, witnesses involved, geographical proximity, time, physical evidence, motive and intent. At the preliminary hearing, the State produced evidence that Owen struck Joseph in the chest, Joseph immediately went into convulsions and stopped breathing, and Joseph died several hours later. We cannot say that the charge was wholly unrelated to the evidence produced at the hearing.

Further, the information was amended before trial to charge Owen with recklessly causing great bodily harm to a child contrary to § 948.03(3)(a), STATS., the offense of which Owen was convicted. Accordingly, we conclude that Owen was not prejudiced in any way by the trial court's refusal to dismiss the original information. Owen makes no claim that the filing of the original information prejudiced his ability to have a fair trial. *See Wolverton*, 193 Wis. 2d at 254, 533 N.W.2d at 174.

## SENTENCING

Finally, Owen claims that the trial court erroneously exercised its discretion when it sentenced him to the maximum possible sentence for the offense. Sentencing is a matter of trial court discretion. *State v. Harris*, 119 Wis. 2d 612, 622, 350 N.W.2d 633, 638 (1984). There is a strong public policy against interfering with the trial court's sentencing discretion. *Id.* As long as the trial court considered the proper factors and the sentence was within the statutory limitations, the sentence will not be reversed unless it is so excessive as to shock the public conscience. *Ocanas v. State*, 70 Wis. 2d 179, 183-85, 233 N.W.2d 457, 460-61 (1975).

In this case, the trial court sentenced Owen to five years in prison, the maximum sentence for the offense. While the trial court noted that Owen did not have a prior criminal record and had shown remorse, it determined that the maximum sentence was justified because of the need to deter others from recklessly harming children and the fact that Owen's conduct caused Joseph's death, the worst result within the range of the definition of great bodily harm. The court considered proper factors and imposed a sentence within the parameters permitted by law. The weight to be given each relevant factor is particularly within the discretion of the trial court. Further, the sentence is not so excessive so as to shock public conscience. Therefore, we conclude that the trial court did not erroneously exercise its discretion by imposing the maximum five-year sentence.

## CONCLUSION

In sum, we conclude that: (1) there was sufficient evidence to support the judgment of conviction; (2) the trial court did not err by admitting the expert testimony; (3) Owen was not denied effective assistance of counsel; (4) the trial court did not err when it refused to suppress Owen's statements to police; (5) any error in the preliminary hearing was harmless; (6) the trial court did not err by refusing to dismiss the information; and (7) the trial court properly exercised its discretion in sentencing Owen. Therefore, we affirm the judgment and order.

*By the Court.*—Judgment and order affirmed.