**COURT OF APPEALS
DECISION
DATED AND FILED**

**June 29, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1709**

STATE OF WISCONSIN

Cir. Ct. No. **2018ME406**

**IN COURT OF APPEALS
DISTRICT III**

IN THE MATTER OF THE MENTAL COMMITMENT OF T. A. T.:

MARATHON COUNTY,

    PETITIONER-RESPONDENT,

  V.

T. A. T.,

    RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Marathon County: LAMONT K. JACOBSON, Judge. *Affirmed*.

¶1 SEIDL, J.[1] Travis[2] appeals from an order for involuntary commitment under WIS. STAT. ch. 51. He argues Marathon County failed to meet

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

its burden to prove that he was dangerous by showing that he "[e]vidence[d] a substantial probability of physical harm to himself … as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm." *See* WIS. STAT. § 51.20(1)(a)2.a. We agree with the circuit court that the County met its burden to prove that Travis was dangerous. We therefore affirm.

## BACKGROUND

¶2 Travis was taken into custody pursuant to a statement of emergency detention on October 23, 2018. In the statement of emergency detention, which was filed in Oneida County, police officer Katy Slizewski reported that she had responded to an address in Three Lakes, Wisconsin, "for a report of a male subject who had fallen by the lake." When Slizewski arrived at the address, she found Travis "[lying] on the ground by the lake[,] and he had a very strong odor of intoxicants." According to the statement of emergency detention, Travis "did state several times that he wanted to die and he just wanted to be by the lake and die."

¶3 On October 25, 2018, Oneida County moved to change venue to Marathon County, which was the county of Travis's residence. At a probable cause hearing held the next day, Travis stipulated to both probable cause and the change in venue.

¶4 A final commitment hearing took place in Marathon County on November 16, 2018. At the hearing, Slizewski testified that when she first interacted with Travis on October 23, he was "[lying] on the ground and he

---

[2] For ease of reading, we refer to the appellant in this confidential matter using a pseudonym, rather than his initials.

2

smelled of intoxicants." According to Slizewski, Travis "continuously said over and over again that he wanted us to leave him alone, leave him there to die, that he just wanted it all to be over."

¶5 Three medical professionals also testified at the final hearing. First, licensed physician John Coates—one of the two individuals who had been appointed by the circuit court to examine Travis—testified that Travis suffered from major depressive disorder and had prescriptions for anti-depressant and anti-anxiety medications. Coates testified Travis told him "that he was hospitalized because he became alcohol intoxicated and then suicidal." Travis also "admitted to an exacerbation of his chronic depression due to multiple family stressors." Coates noted that Travis had previously attempted suicide in 2002, but during the evaluation Travis "described his present mood as fine and denied any suicidal or homicidal ideation." Travis also denied any auditory or visual hallucinations and indicated that he was willing to continue treatment on an outpatient basis.

¶6 Coates testified that Travis's affect was somewhat blunted during the evaluation, his concentration was mildly impaired, and he had poor immediate recall. Coates also testified that Travis "did give evidence that his judgment was recently impaired." When asked to elaborate on that point, Coates stated, "Well, he had some … thoughts of killing himself by drowning, and … as far as I'm concerned, suicide is never a good option and … shows lack of judgment."

¶7 Coates further testified that Travis had "a statistical increased risk of suicide based on the fact that he's attempted suicide in the past." He also acknowledged that Travis had certain risk factors for suicide—namely, that he was elderly and was experiencing "a lot of family stressors." Coates testified that

those risk factors would be "exacerbated" by the consumption of a large amount of alcohol.

¶8 Coates nevertheless opined that Travis did not pose a substantial risk of dangerousness to himself. He explained:

> I think part of what happened most recently was due to alcohol intoxication and … he did express a willingness to … continue treatment as an outpatient, so there is—there will always be an increased risk for suicide, but I think based on what happened recently, I think that—and his willingness to … be treated as an outpatient, I think he could just continue treatment as an outpatient on a voluntary basis.

Coates also testified that Travis understood the importance of his prescribed medications and indicated that he was willing to continue taking them. Coates later reiterated that, based on Travis's "attitude" at the time of the evaluation and his "willingness to accept treatment," Coates did not believe Travis was dangerous, despite his risk factors for suicide and his "statistical increased risk for suicide because of a previous attempt and the recent suicidality … his suicidal ideation that—thoughts of maybe drowning himself."

¶9 Next, the circuit court heard testimony from the second court-appointed examiner, psychologist Nicholas Starr. Like Coates, Starr diagnosed Travis with major depressive disorder. Starr testified Travis told him "that his recent hospitalization was the result of a misunderstanding. He said he simply had been severely intoxicated and fell off a swing, rolled down a hill and almost ended up in the lake." Starr stated, however, that Travis's treatment records "indicate[d] that he was making suicidal statements, and he acknowledged he could not recall exactly what happened" during the October 2018 incident. Starr also testified that Travis's mood during the evaluation was "unstable,"

explaining that Travis "was sad and tearful, and he can be impulsive and have poor judgment at times."

¶10      Starr then opined that Travis presented a risk of dangerousness to himself. As the basis for that opinion, Starr stated Travis "has made numerous attempts to end his life and he's had significant periods where he becomes so intoxicated he has no awareness or control of what he's doing." Specifically, Starr testified that Travis's treatment records reflected two prior suicide attempts in 2001 and 2002, respectively.

¶11      Starr further opined that Travis's risk of harm to himself would be exacerbated by his consumption of a significant amount of alcohol because alcohol would make his medications less effective, "and when a person does consume alcohol, they are much more impulsive and have less and less control of their abilities." Starr testified he believed a commitment was necessary in Travis's case in large part due to his alcohol consumption and its effect on his decision-making. He reiterated that Travis's alcohol use and mental illness together created a "significant or substantial risk of dangerousness moving forward."

¶12      On cross-examination, Starr conceded that he was not aware of any suicide attempts by Travis since 2002. Starr also conceded that, aside from the incident by the lake in October 2018, he was not aware of any other specific instances of excessive alcohol consumption by Travis. He stated, however, that he did not have access to Travis's VA records, and there was a "strong element of denial where [Travis] is not able to provide accurate information about" his alcohol consumption.

¶13     The circuit court also heard testimony from Anne Dibala, who was Travis's attending psychiatrist after he was taken into custody pursuant to the statement of emergency detention.  Dibala diagnosed Travis with major depressive disorder, severe posttraumatic stress disorder (PTSD) without psychosis, generalized anxiety disorder, and alcohol use disorder.  When asked to provide an opinion as to whether Travis posed a substantial risk of dangerousness to himself, Dibala responded:

> He has a long history of this recurrent depression and PTSD with multiple treatments, and even after discharge he has made near fatal attempts to kill himself, even after he was on a ninety day settlement.  After that settlement agreement expired, he attempted to hang himself and was found by his family.
>
> Because these are lifelong serious comorbid disorders and he has multiple risk factors for suicide, I would recommend that—I think he's at a risk for suicide because of multiple suicide attempts and that he needs the best insurance to ensure that he continues the safest course with a monitored, legally enforced commitment to ensure his safety and well-being and the safety and well-being of his family.  His wife has been terrified that he would try to kill himself again.

Dibala further testified that her opinion regarding dangerousness took into account Travis's actions during the October 2018 incident.  She recommended that Travis be committed for continuing treatment.

¶14     Travis testified that he had struggled with depression since he was sixteen, when he witnessed the drowning deaths of his father and uncle.  He also testified that he experienced PTSD after leaving the military in 2002 and was drinking heavily at that time.  He denied any heavy drinking since then, however, and stated his consumption of alcohol on October 23, 2018, was unusual for him.

Travis acknowledged that counseling was helpful for him, and he also agreed that he needed medication.

¶15 Travis testified that he went to his cabin on October 23, 2018, because he wanted to be alone after learning that his son and daughter-in-law were getting a divorce. He stated he had no intention of killing himself, and he planned to have only a couple of drinks, but he "ended up drinking way too much." He testified, "[W]hat I said when I was drunk was probably different than what I was really going through." He also stated that since being discharged from the crisis center on October 31, 2018, he had not felt like hurting himself and had not consumed any alcohol. Travis further testified that since his discharge, he had enrolled in counseling services at the local VA clinic, he had begun attending group therapy for "alcohol related problems," and he intended to enroll in group therapy for PTSD.

¶16 In an oral ruling, the circuit court stated it was undisputed that Travis was mentally ill and a proper subject for treatment, and the case "boil[ed] down to an assessment as to what the risk of dangerousness is." The court then observed that all three of the expert witnesses "agree[d] there is a level of dangerousness … to [Travis] himself." The court noted that although Coates did not believe Travis posed a substantial risk of harm to himself, he testified Travis had a "statistically greater risk of suicide … based upon his history and recent use of alcohol." The court then cited Starr's testimony that Travis had previously attempted suicide in 2001 and 2002; that the consumption of alcohol would increase Travis's risk of suicide; and that during the recent October 2018 incident, Travis "fell down a hill and was reported as having made suicidal statements." The court also noted that Dibala—who was Travis's treating physician and therefore had more information about him than Coates and Starr—opined that he posed a substantial risk of

dangerousness to himself based on her review of his records and his "multiple risk factors."

¶17 Ultimately, the circuit court stated that although the issue of dangerousness presented a "close call," the County had proved by clear and convincing evidence that Travis posed a substantial risk of harm to himself, based on Starr's and Dibala's testimony, along with Slizewski's testimony "that she found [Travis] on the ground and that when she contacted him, he continuously said that he wished to be left alone to die." The court therefore ordered Travis committed to the care and custody of the County for a period of six months. The court declined, however, to enter an order for involuntary medication and treatment. Travis now appeals from the court's commitment order.[3]

## DISCUSSION

¶18 To involuntarily commit an individual under WIS. STAT. ch. 51, the petitioner has the burden to show by clear and convincing evidence that the individual is: (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous to himself or herself or to others. WIS. STAT. § 51.20(1)(a)1.-2., (13)(e). Travis does not dispute that the County established the first two of these elements. He argues, however, that the County failed to meet its burden to

---

[3] Travis's commitment order expired on May 16, 2019, before the parties filed their briefs in this appeal. Nonetheless, neither Travis nor the County addresses whether this appeal is moot. *See Marathon Cnty. v. D.K.*, 2020 WI 8, ¶¶22-25, 390 Wis. 2d 50, 937 N.W.2d 901 (an appeal from an expired commitment order is moot, unless the order results in collateral consequences that persist even after the order has expired). We will not abandon our neutrality to develop arguments on behalf of the parties. *Industrial Risk Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82. We therefore assume without deciding that this appeal is not moot, and we address the merits of Travis's appellate arguments.

establish that he was dangerous. Whether the County presented sufficient evidence to establish dangerousness presents a mixed question of fact and law. *See Waukesha Cnty. v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. We will uphold the circuit court's findings of fact unless they are clearly erroneous, but whether the facts satisfy the statutory standard is a question of law that we review independently. *Id.*

¶19 In this case, the County argued—and the circuit court agreed—that Travis was dangerous under WIS. STAT. § 51.20(1)(a)2.a. An individual is dangerous under that subdivision paragraph if he or she "[e]vidences a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm." Sec. 51.20(1)(a)2.a. The term "substantial probability" means "much more likely than not." *Marathon Cnty. v. D.K.*, 2020 WI 8, ¶35, 390 Wis. 2d 50, 937 N.W.2d 901 (citation omitted).

¶20 Travis contends the County failed to meet its burden of proof under WIS. STAT. § 51.20(1)(a)2.a. because it did not introduce evidence of any recent threats of, or attempts at, suicide or serious bodily harm. He first asserts that his suicide attempts dating to 2002 and earlier were not "recent" under the ordinary meaning of that term. He further argues that the incident by the lake in October 2018, while recent, was not a suicide attempt. Finally, Travis asserts that his comments during the October 2018 incident about wanting to be left to die did not constitute threats of suicide. The County, for its part, does not argue that it presented evidence of recent attempts at suicide or serious bodily harm. Instead, the County argues it established dangerousness under § 51.20(1)(a)2.a. because Travis's statements during the October 2018 incident were threats of suicide.

9

¶21    In *Outagamie County v. Michael H.*, 2014 WI 127, ¶1, 359 Wis. 2d 272, 856 N.W.2d 603, our supreme court addressed "what satisfies [WIS. STAT. § 51.20(1)(a)2.a.'s] requirement of 'evidence of recent threats ... of suicide.'" In that case, the record showed that Michael had moved to Minnesota following a hospitalization in Wisconsin for treatment for a mental illness. *Michael H.*, 359 Wis. 2d 272, ¶8. In February 2013, Michael returned to Wisconsin to visit family for a week. *Id.* Throughout the week, Michael exhibited a variety of bizarre and concerning behaviors. *Id.*, ¶¶9-15. On three occasions, Michael stated he wanted to go to the hospital and was taken there by family, but he then refused medication and did not stay. *Id.*, ¶¶11-13.

¶22    Michael was ultimately taken to the hospital a fourth time, and when a nurse in the emergency room asked if he was suicidal, he responded "yes." *Id.*, ¶¶15-16. Michael's mother, who was concerned that he was planning to commit suicide, then asked him "what his plan was." *Id.*, ¶16. In response, Michael did not deny having a plan, but he stated "that it was too hard to explain, it was too long, he could not explain, and he did not know." *Id.* Michael then ran from the hospital. *Id.* When police found him a short time later and returned him to the hospital, he denied thinking of suicide and told one of the officers that he had only wanted to hurt himself. *Id.*, ¶17.

¶23    On appeal, Michael argued "[t]he evidence that he answered 'yes' when he was asked if he was suicidal [was] not evidence of a recent threat of suicide … because thoughts are not threats and because he took no act in furtherance of the thoughts." *Id.*, ¶32. Our supreme court disagreed, concluding the evidence was sufficient for the jury to conclude that Michael's statements constituted recent threats of suicide. *Id.*, ¶¶34-37. The court reasoned that the ordinary definitions of the word "threat" include "an indication of impending

10

danger or harm," and under that definition, "the jury could reasonably have considered Michael's statements to be threats." *Id.*, ¶34.

¶24     The court refused to hold that "an articulation of a specific plan is necessary in order to constitute a threat for purposes of" WIS. STAT. § 51.20(1)(a)2.a. *Michael H.*, 359 Wis. 2d 272, ¶37. The court explained that one of the purposes of WIS. STAT. ch. 51 "is to facilitate treatment for the dangerous mentally ill who will benefit from it," and "[i]t would be unreasonable to expect a person who is in a poor or confused mental state to be capable of making a clear and coherent statement of intention of what his or her plans are." *Michael H.*, 359 Wis. 2d 272, ¶35. Requiring such a statement "would render the statute unworkable for the very people for whom it is designed." *Id.* The court instead held that "[w]here credible evidence supports an inference that a person who affirmed that he [or she] was suicidal had an intent to act, we will not reverse a jury's dangerousness finding on the grounds that the person was not specific enough in articulating his [or her] intent." *Id.*, ¶4.

¶25     Under *Michael H.*, Travis's statements during the October 2018 incident by the lake constituted recent threats of suicide. Again, Slizewski testified that during that incident, Travis "continuously said over and over again that he wanted us to leave him alone, leave him there to die, that he just wanted it all to be over." Those statements certainly qualified as "indication[s] of impending danger or harm" to Travis. *See id.*, ¶34.

¶26     Although Travis testified he had no intention of killing himself during the October 2018 incident, the circuit court was not required to accept his testimony in that regard. *See State v. Peppertree Resort Villas, Inc.*, 2002 WI App 207, ¶19, 257 Wis. 2d 421, 651 N.W.2d 345 (when the circuit court acts as

11

the finder of fact, it is the ultimate arbiter of the witnesses' credibility and the weight to be given to their testimony). And, contrary to Travis's testimony, Coates testified that Travis "told me that he was hospitalized because he became alcohol intoxicated *and then suicidal*." (Emphasis added.) Coates also testified that Travis had "thoughts of killing himself by drowning." Coates' testimony gives rise to a reasonable inference that Travis's statements during the October 2018 incident were not mere drunken ramblings but instead were threats of suicide on which Travis had an intent to act.

¶27 Based on Travis's recent threats of suicide during the October 2018 incident, and all of the other evidence presented at the final hearing, the circuit court properly determined that Travis evidenced a substantial probability of harm to himself. As the court correctly noted during its oral ruling, all three expert witnesses testified that Travis presented some risk of dangerousness to himself. While Coates denied that the risk was substantial, he acknowledged that Travis had a statistically increased risk of suicide based on his past suicide attempts and other risk factors, specifically his age and "family stressors."

¶28 The circuit court also properly credited Starr's and Dibala's testimony regarding the risk of harm to Travis. Starr testified that Travis presented a "significant or substantial risk of dangerousness moving forward." In support of that opinion, he referenced Travis's "suicidal statements" during the October 2018 incident; his prior suicide attempts; and his consumption of alcohol, which Starr explained exacerbated the risk posed by Travis's major depressive disorder. Starr also noted that Travis's mood during his evaluation was "unstable" and that he at times evidenced impulsivity and poor judgment. Dibala similarly testified that Travis was at risk of suicide, and should therefore be committed for treatment, based on his long history of depression and PTSD, his conduct during

the October 2018 incident, his multiple risk factors for suicide, and his prior suicide attempts—one of which occurred soon after he had been discharged from treatment and completed a settlement agreement.

¶29 The circuit court was entitled to rely on Starr's and Dibala's testimony in concluding that Travis was dangerous under WIS. STAT. § 51.20(1)(a)2.a. In addition, the court could properly rely on Coates' testimony that Travis had a statistically increased risk of suicide, while rejecting Coates' ultimate opinion that Travis did not pose a substantial probability of harm to himself. *See **State v. Owen***, 202 Wis. 2d 620, 634, 551 N.W.2d 50 (Ct. App. 1996) (a fact finder may accept portions of an expert witness's testimony while rejecting others). Based on all three expert witnesses' testimony, as well as Slizewski's testimony regarding Travis's statements during the October 2018 incident, the court properly concluded the County had met its burden to prove that Travis was dangerous under § 51.20(1)(a)2.a.[4]

¶30 Travis emphasizes that neither Starr nor Dibala used the "substantial probability" language set forth in WIS. STAT. § 51.20(1)(a)2.a. during their

---

[4] As noted above, Coates, Starr, and Dibala each relied on Travis's prior suicide attempts in support of their opinions. We agree with Travis that those attempts—which occurred in 2001 and 2002—do not constitute "recent" suicide attempts for purposes of WIS. STAT. § 51.20(1)(a)2.a.

Nevertheless, we agree with the County that the expert witnesses could properly consider those prior suicide attempts when assessing Travis's present dangerousness. As Coates explained during his testimony, the fact that Travis had attempted suicide in the past increased the "statistical probability" that he would attempt suicide again. Accordingly, while the past suicide attempts, standing alone, would not provide a basis to find Travis dangerous under WIS. STAT. § 51.20(1)(a)2.a., they were relevant to determining whether Travis—who had been detained after police found him intoxicated, lying on the ground, and repeatedly stating that he wanted to be left to die—evidenced a substantial probability of physical harm to himself at the time of the final hearing.

testimony. Travis therefore asserts the evidence was insufficient to establish dangerousness under that subdivision paragraph. Relatedly, he notes that the circuit court stated the evidence showed he presented a "substantial risk of harm to himself," rather than a "substantial probability" of harm. As such, he contends the court failed to apply the correct legal standard.

¶31 Travis's arguments regarding the experts' and the circuit court's failure to use the "substantial probability" language in WIS. STAT. § 51.20(1)(a)2.a. lack merit. Our supreme court recently clarified that such "magic words" are not required to support a determination of dangerousness. *See* **D.K.**, 390 Wis. 2d 50, ¶54.

¶32 D.K. was found to be dangerous under WIS. STAT. § 51.20(1)(a)2.b., which states that an individual is dangerous if he or she "[e]vidences a substantial probability of physical harm to other individuals as manifested by … evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a … threat to do serious physical harm." *See also* **D.K.**, 390 Wis. 2d 50, ¶54. Rather than using the exact words set forth in the statute, one of the expert witnesses had testified that D.K. "was paranoid and suffered from delusions; presented a 'substantial risk of danger' 'to other people'; and 'plan[ned] on strangulating the police officer and also killing' other people." **Id.** (emphasis omitted). On appeal, D.K. contended that testimony was insufficient to establish dangerousness because the expert "was required"—but failed—"to testify to the exact statutory standard" for dangerousness. **Id.**

¶33 Our supreme court rejected D.K.'s argument, stating that witnesses and circuit courts are not required to "recite magic words" in WIS. STAT. ch. 51 cases. **D.K.**, 390 Wis. 2d 50, ¶54; *see also* **D.K.**, 390 Wis. 2d 50, ¶66 (R.G.

14

Bradley, J., concurring) ("We do not impose a 'magic words' requirement in the law and this court has repeatedly rejected them."). Instead, it is necessary only that "a medical expert's testimony and conclusions 'should be linked back to the standards in the statute.'" *Id.*, ¶54 (citation omitted). The court concluded the expert's testimony in *D.K.* was sufficiently linked to the statutory standard. *Id.*

¶34 Here, we similarly conclude that the experts' testimony was sufficiently linked to the dangerousness standard in WIS. STAT. § 51.20(1)(a)2.a. Based on the October 2018 incident, Travis's prior suicide attempts, and the combined effects of his alcohol consumption and major depressive disorder, Starr testified that Travis posed a "significant or substantial risk of dangerousness moving forward." When asked whether Travis posed "a substantial risk of dangerousness to himself," Dibala responded, in part, that he was "at a risk for suicide" based on the October 2018 incident and his prior suicide attempts. Based on Travis's risk of dangerousness to himself, both experts recommended that he be committed for treatment. On this record, although neither Starr nor Dibala precisely recited the language set forth in § 51.20(1)(a)2.a., it is clear they both determined that Travis met the standard for dangerousness set forth in that subdivision paragraph.

¶35 The circuit court, in turn, clearly determined that Travis was dangerous under WIS. STAT. § 51.20(1)(a)2.a., even though the court stated he posed a "substantial risk" of harm to himself rather than a "substantial probability" of harm. In any event, as Travis acknowledges, we independently review whether the facts found by the circuit court satisfy the statutory requirements for commitment. *See J.W.J.*, 375 Wis. 2d 542, ¶15. Here, for all of the reasons explained above, we conclude the evidence introduced at the final hearing was

15

sufficient to establish that Travis was dangerous under § 51.20(1)(a)2.a. We therefore affirm the commitment order.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.